UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 07-35-P-H |
| | ) | |
| TIMOTHY GIGGEY, | ) | |
| | ) | |
| DEFENDANT | ) | |

**MEMORANDUM OF SENTENCING**

Two issues justify writing an opinion in support of this arson sentencing. First, there is a difficult question concerning how to determine what amount of loss is reasonably foreseeable for arson of a building undergoing renovations, with higher insurance coverage than apparent market value. Second, the case highlights the deep and longstanding Circuit split over how to treat prior non-dwelling burglary convictions in deciding who is a career offender. Career offender status imposes a huge increase in sentence length (here, 151 to 188 months instead of 63 to 78 months). Given the central purpose of the Sentencing Guidelines to avoid sentencing disparity in federal courts around the country, the Court of Appeals for the First Circuit might want to revisit this important issue *en banc*, and the Supreme Court should resolve the discrepancy among the Circuits, since the Sentencing Commission seems unwilling or unable to do so.

**FACTS OF THIS CRIME**

Timothy Giggey, his brother, and a juvenile set a number of small fires in a commercial building in downtown Lewiston, Maine, on December 19, 2006, hoping to divert attention while they burglarized another building. They caused a conflagration that razed an entire city block. Remarkably, no one was injured. The buildings were undergoing renovation as a federally funded project. As a result, the three faced both federal and state charges. Giggey pleaded guilty to the federal crime of malicious destruction by fire of property owned by an organization receiving federal financial assistance, 18 U.S.C. § 844(f).

**OFFENSE LEVEL CALCULATIONS**

*Amount of Loss*

Giggey's base offense level is determined initially by Guideline 2K1.4, the arson Guideline. United States Sentence Commission Guideline Manuel 2K1.4 (2006 ed.) ("USSG"). Subsection (a)(3) cross-references Guideline 2B1.1 and its amount-of-loss table.[1] Application Note 3 states that the general rule is that the amount of loss is the greater of the "intended loss" and the "actual loss." The "intended loss" is the "pecuniary harm that was intended to result from the offense." "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense."

The buildings that Giggey and his companions destroyed in December 2006 were vacant buildings destined for restoration into commercial, residential and

---

[1] That Guideline, which applies to many forms of property offenses, determines the offense level *(continued next page)*

2

office space.  According to undisputed sections of the Presentence Report, the buildings were purchased in 2004 for $300,000.  Around that same time the City of Lewiston appraised their value at $182,333.34 (an extrapolation from a 75% assessed value of $136,750).  The Presentence Report, ¶ 3, adds that the owners[2] of the property invested $150,000 of their own money in demolition and restoration, as well as $50,000 that they borrowed from the City of Lewiston, as reported to investigators from the State Fire Marshal's Office after the fire, for a total investment of $500,000.

Giggey introduced evidence that on December 14, 2006, just days before the arson, the owners brought a real estate broker to the project.  His report was not particularly positive about the renovations' progress.  He stated that the project was at a standstill, that one of the owners said that the owners had invested $700,000 to $800,000[3] and needed $800,000 more to move forward with the project, and that the owner was looking to sell the buildings and the plans outright and "was just looking to recover his investment." Def. Ex. 1 ¶ 6.[4]  That

---

by increasing the base level in proportion to the amount of loss caused by the offense.

[2] I do not distinguish the shareholders from the corporation.

[3] The accuracy of this number seems suspect in light of the investment numbers (totaling $500,000) that the owners gave the State Fire Marshal's Office immediately after the fire.

[4] After the fire, the broker told ATFE agents that at the time of his visit "the building was mostly empty of contents, and many of the walls were just framing[, . . .] that on the second floor, of the three story building, there was a large pile of paper and other debris[, . . .] that the pile was next to the wall that bordered the four story building, and that the pile was approximately 1-2 feet high and four foot around[, . . .] that there was an entry way connecting the two buildings near the debris pile[, . . .] that [an owner] told him that most of the paper and other items came from the lawyer's office that used to be in the building[, . . .] that he also observed some Waines Coating [sic] (4' x '8 sheets) stacked a short distance away from debris pile, but [the owner] stated that the contractors had placed it there[, . . .]  that [according to the owner] vandals were a constant problem at the building[, . . .] that he did not see any other signs of vandals such as graffiti or vandalism[, and] that he did not observe any electrical power in the building [or] any extension cords or other electrical tools lying around.  Def. Ex. 1 ¶¶ 3-4.

statement suggests a fair market value of $700,000-$800,000, arguably somewhat more if it represents a distress value.

However, the owners had insurance coverage for a substantially higher sum. Peerless Insurance Company (Peerless) issued a Builders Risk Policy of $4 million which, according to the Presentence Report (uncontested), "means that the policy covered the buildings in their state at the time the policy was purchased, as well as, any projected additions, alterations, improvements, or repairs." Following the fire, the owners claimed a total loss of over $5 million—a figure they based on the projected value of the property post-restoration. Ultimately, the owners settled with Peerless on a reimbursement amount of $3,200,000, which has been paid in full.

The fact that the property was insured does not negate the loss caused by the arson. The property owners may have been reimbursed for their loss, but the insurance company is out $3,200,000 as a result of this offense. See United States v. Alegria, 192 F.3d 179, 191 (1st Cir.1999) ("insurance simply shifts the loss to another victim (the insurance company)"). The question under Guideline 2B1.1 for the purposes of sentencing, however, remains the amount of pecuniary harm that was "intended" or was "reasonably foreseeable" by Giggey.

The government argues that, given the circumstances, Giggey reasonably should have known that the property was insured for more than the owners had invested in it ($500,000) and for more than they were willing to sell it for ($700,000-$800,000). According to the government, the "actual loss" for offense level purposes should be the full amount that Peerless paid, namely $3,200,000.

4

But there is no evidence that Giggey intended that amount of loss (there is no evidence at all about his intent concerning the amount of loss) or that he reasonably should have known that a sum of that magnitude would be the potential pecuniary loss.[5] That amount appears to be far beyond the market value and I have no evidence how the insurance company derived it. I do not agree that it was reasonably foreseeable to Giggey under the circumstances that this vacant building would generate an insurance settlement many times that of its fair market value. Here, what was reasonably foreseeable as pecuniary harm was that this building would be insured for its market value or its replacement cost. (There is no evidence of the latter.) Although specialists in the field of renovations may be familiar with Builder Risk Policies, I am not persuaded that Giggey's statements that he has a "carpentry background" and that he finds that renovations are "neat to look at" make this $3,200,000 insurance settlement reasonably foreseeable to him as the amount of potential pecuniary loss.

Taking into consideration the relevant factors listed in Application Note 3(C)—the estimated fair market value of the property, the estimated cost of replacement or repairs, as well as more general factors such as the scope of the offense—I estimate the reasonably foreseeable pecuniary harm to be greater than $400,000 but less than $1,000,000.

---

[5] "For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG 2B1.1, Application Note 3(A)(iv).

Under Guideline 2B1.1, when the loss is between $400,000 and $1 million, the base level of 7 (2B1.1(a)(1)) is increased by 14 (2B1.1(b)(1)(H)) to a total of 21. Guideline 2K1.4(a)(3), the arson Guideline, says to add 2 levels to the 2B1.1 total of 21, and 2 more when the arson was committed to conceal another offense (here to commit a burglary). USSG 2K1.4(b)(1). Therefore, the adjusted offense level is 25. Giggey receives a 3-level decrease for accepting responsibility. USSG 3E1.1. As a result, the total offense level is 22. Giggey's criminal history points give him a criminal history of IV.[6]

Therefore, the guideline range is 63 to 78 months, unless Giggey qualifies as a career offender.

*Career Offender Status*

In an effort to implement 28 U.S.C. § 994(h), the Commission has adopted Guideline 4B1.1, the so-called career offender Guideline. As relevant to Giggey's situation, it provides that if the sentencing offense is a crime of violence (Giggey's arson is) and if the defendant has two previous convictions for crimes of violence, he is considered a career offender, with a significantly higher offense level and criminal history and thus a significantly higher prison range. For Giggey, the sentencing range rises dramatically from the range of 63 to 78 months to a new range of 151 to 188 months in prison.[7]

---

[6] At sentencing, I rejected Giggey's claim that his two burglary convictions were uncounseled. He withdrew the claim as to one, because the court papers demonstrated that he was represented. On the other, I found that the state court transcript showed a voluntary and intelligent waiver.
[7] The parties agree that if Giggey is a career offender his total offense level is 29 and his Criminal History is VI.

6

In Giggey's case, the two previous convictions that make him a career offender, more than doubling his prison range, are burglaries. In one, he burglarized a garage. (A charge of burglarizing the dwelling was dismissed.) The state justice gave him 90 days in county jail. In the other, Giggey burglarized a redemption center. For that, he received 4 months in jail.[8]

The government contends that both burglary convictions are crimes of violence and thus that Giggey is a career offender. I reluctantly agree, because First Circuit precedents compel that conclusion, and I am bound to apply those precedents. I think those precedents misread the relevant Guideline text, however. Moreover, even if the First Circuit is correct in its reading, there is a deep split among the Circuits on this precise issue that now is fourteen years old. The split guarantees that the career offender Guideline is being applied with severe disparity nationwide, contrary to the basic premise of Guideline sentencing. Supreme Court review is needed.

For career offender purposes, "crime of violence" is a term defined in Guideline 4B1.2 and Application Note 1.[9] The term "crime of violence" includes, explicitly, "burglary of a dwelling." USSG 4B1.2(a)(2). Neither of Giggey's previous convictions involved burglary of a dwelling. The definition also includes other convictions where an *element* of the offense involved physical force against a

---

[8] For these descriptions I have relied solely upon the convictions and charging documents. More details are known from a guilty plea transcript in one case, and additional facts in the other case are undisputed. I mention them in the Departure section of this opinion.

[9] The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is *(continued next page)*

person—actual, threatened, or attempted. USSG 4B1.2(a)(1). Neither of Giggey's burglary offenses had that element. Finally, the definition includes convictions where the conduct that was "expressly charged" either involved use of explosives (not Giggey), "or, by its nature, presented a serious potential risk of physical injury to another." USSG 4B1.2, Application Note 1. The First Circuit has held, now repeatedly, that to charge burglary of a structure, of *any* structure, *ipso facto* and without more, expressly charges conduct that by its nature presents a serious potential risk of physical injury to another. The effect is to read the Guideline language "burglary of a dwelling" as if it said "burglary of a structure."

The First Circuit case that created that rule was United States v. Fiore, a case where the previous conviction involved burglary of a commercial structure. 983 F.2d 1 (1st Cir. 1992). The court believed that "burglary of a commercial building poses a potential for episodic violence so substantial as to bring such burglaries within the violent felony/crime of violence ambit." Id. at 4. The most recent case First Circuit case reaffirming the rule is United States v. Rodriguez, also involving burglary of a commercial structure. 311 F.3d 435 (1st Cir. 2002). But the full scope of the rule is expressed in United States v. Sawyer, 144 F.3d 191 (1st Cir. 1998). Sawyer announced that Fiore's rule extends "to any conviction for a non-dwelling burglary where the statute violated includes the elements of a 'generic' burglary as defined by the Supreme Court in Taylor."[10]

---

inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993). The Commentary here, therefore, is authoritative.
[10] Taylor v. United States, 495 U.S. 575 (1990).

8

Sawyer, 144 F.3d at 195.  In Sawyer, the "structure" was an "unfinished home" with no indication "how close the house was to completion."  Id.  According to Sawyer:

> Whether the structure is most appropriately characterized as a dwelling, a commercial building, or more broadly as a non-dwelling is of no consequence in light of our determination that Fiore extends 'crime-of-violence' classification to burglaries of any type of structure."

Id.  Giggey's two prior burglary convictions involved structures, one commercial, one a garage where the dwelling burglary was dismissed.  They simply cannot escape the broad scope of Sawyer.  I therefore find that Giggey is a career offender under Guideline 4B1.1.

Respectfully, however, I suggest that the First Circuit could usefully revisit these precedents *en banc*, now that there have been caselaw developments in other Circuits and in the First Circuit itself.[11]  Much is at stake here, in terms of years and years of imprisonment for Giggey and for others.

A re-visitation might consider the following.  As originally adopted, the career offender Guideline text referred to 18 U.S.C. § 16's definition of crime of

---

[11] Sawyer recognized disagreement from the Tenth Circuit, but said: "Whatever the merits of this approach, it is not the one this court has followed, and we are not at liberty to revisit the question without more reason than Sawyer has provided."  144 F.3d at 195.  Rodriguez stated:
> While the courts of appeals are not unanimous as to the correctness of Fiore's core holding—some circuits have followed in Fiore's footsteps and other have not—we are bound by the law of the circuit doctrine.  That doctrine "holds a prior panel decision inviolate absent either the occurrence of a controlling intervening event (e.g., a Supreme Court opinion on the point; a ruling of the circuit, sitting en banc; or a statutory overruling) or, in extremely rare circumstances where non-controlling but persuasive case law suggests such a course."  Neither circumstance exists here.

311 F.3d 435, 438-39 (1st Cir. 2002) (citations omitted).  Both decisions recognize the need for *en banc* treatment in order to upset an earlier panel decision like Fiore.

violence. USSG 4B1.2 (1988). The Commentary described this definition as applying only to a felony where physical force (actual, threatened or attempted) was either an element of the offense or, by the nature of the offense, a substantial risk. It then stated explicitly that burglary of a dwelling *was* a crime of violence, and that burglary of other structures was *not*. Id., Application Note 1. In 1989, the Commission amended the Guideline and the Commentary to remove both the reference to 18 U.S.C. § 16 and the comment contrasting the two kinds of burglaries, and to add the current language to the Guideline. USSG, App. C., Amend. 268 (effective Nov. 1, 1989) ("Amend. 268"). Now the Guideline text says:

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that —
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

USSG 4B1.2(a). Now, both the Guideline and the Guideline commentary list burglary of a dwelling as categorically a crime of violence. However, neither Guideline nor Commentary says anything explicitly about burglary of other structures.

If the purpose of the 1989 amendment was to change the previous rule so as to treat burglary of *all* structures the same as burglary of a dwelling (as the First Circuit precedents now read it), the logical and simple way to have done so would be simply to have used the language "burglary of a structure" in the initial

10

categorical listing, because that would include both dwellings and non-dwellings. The Commission did not do so.

Instead, one would have expected that by singling out burglary "of a dwelling" as automatically or categorically a crime of violence, the Commission signaled that some extra dimension was necessary to make burglary of a different kind of structure qualify as a crime of violence.[12]  That expectation is confirmed by the other provisions that the Guideline treats as parallel to burglary of a dwelling in identifying what is a crime of violence: namely, a conviction where an actual *element* of the offense involves physical force (actual, threatened or attempted); and a conviction where use of explosives is *expressly* charged.  USSG 4B1.2, Application Note 1.  Mere burglary of a non-dwelling structure seems quite different from conviction for a crime that requires as an element physical force against another person or from a conviction where the express charge is using explosives.

Fiore, however, disagreed and pointed to the 1989 amendment's explanation: that the definition of crime of violence, previously 18 U.S.C. § 16, now was "derived from" section 924(e).  Amend. 268.  Section 924(e) of Title 18 is the so-called Armed Career Criminal statute, another sentencing enhancement provision, but one that is distinct from the career offender statute.  Unlike the career offender statute, the Armed Career Criminal statute has its own statutory

---

[12] The distinction is common.  Statutes of states like Maine, for example, treat burglary of a dwelling as being more serious a crime than burglary of other structures.  See 17-A M.R.S.A. § 401(B)(3), (C) (2000) ("Burglary is classified as . . . [a] Class B crime if . . . [t]he violation was against a structure that is a dwelling place . . . .  All other Burglary is a Class C crime").

11

definition of "violent felony," and explicitly includes within it generic "burglary," without the "of-a-dwelling" limitation that the Commission has adopted for identifying career offenders. 18 U.S.C. § 924(e)(2)(B). Construing this unadorned statutory term "burglary," the Supreme Court in Taylor, not surprisingly, refused to limit this generic term to burglary of a dwelling. What is surprising is that Fiore determined that the Taylor approach for section 924(e) applied to Guideline 4B1.2's career offender definition for crime of violence. It is surprising not only because of the difference in the language ("burglary" vs. "burglary of a dwelling") but also because the Note to 4B1.4 (the Armed Career Criminal Guideline) says explicitly that the two definitions for violent crime are "not identical."[13]

The reasoning of Fiore[14]-Sawyer-Rodriguez is even more problematic in light of the First Circuit's decision in United States v. Peterson, 233 F.3d 101 (1st Cir. 2000). In Peterson, the First Circuit interpreted section 924(e)'s definition of violent felony to mean that a Rhode Island breaking-and-entering conviction (defined as: of a *dwelling*, any time of the day or *night*, unoccupied or *occupied*) is *not* a violent felony, even though burglary is. Id. at 108. The distinction is that

---

[13] The Sixth Circuit observes: "It is important to note that the comment says the definition of a crime of violence is 'derived from,' not that it is identical to, 18 U.S.C. § 924(e)." United States v. Wilson, 168 F.3d 916, 927 n.9 (6th Cir. 1999). The actual text of USSG 4B1.4, Application Note 1, is:
> It is to be noted that the definitions of "violent felony" and "serious drug offense" in 18 U.S.C. § 924(e)(2) are not identical to the definitions of "crime of violence" and "controlled substance offense" used in § 4B1.1 (Career Offender) . . . .

[14] For a lengthier (and sometimes tendentious) critique of Fiore's use of Taylor see Comment: The United States Sentencing Commission and the Problem of Nonresidential Burglary under the Career Offender Provision of the Federal Sentencing Guidelines, 6 Geo Mason L. Rev. 675, 685-90 (1998).

12

breaking and entering does not require criminal intent, whereas burglary does. According to Peterson:

> In specifying burglary as a violent felony, Congress made its own categorical judgment as to what subset of breaking and entering offenses "presents a serious potential risk of physical injury to another." Had Congress wished to cast a wider net, it could have easily used the more general term "breaking and entering" instead. But it chose to single out burglary, and it defined that term to include a criminal intent requirement. We are not at liberty to dilute or eliminate that criminal intent requirement; yet that is precisely the effect that would result were we to determine that § 11-8-2 falls under the "otherwise" clause. If breaking and entering is to be considered a violent felony regardless of any criminal intent requirement, then that limitation placed on the definition of burglary is rendered meaningless.

Id. at 109. The same can be said of the Commission's choice of the category "burglary of a dwelling" in categorically defining crime of violence for career offenders. If burglary of *any* structure is also categorically to be considered a crime of violence under the "otherwise" clause regardless of any express charging language, then this use of the "otherwise" clause has rendered meaningless the Commission's limitation language, "of a dwelling."[15]

---

[15] Peterson does refer to this problem in a footnote. It says that it is due to
> a slight discrepancy between [Guideline] 4B1.2(a) and § 924(e)(2)(B)(ii). The two provisions are identical except that the former lists "burglary of a dwelling" rather than simply "burglary" as a violent felony. In order to harmonize [Guideline] 4B1.2(a) with § 924(e)(2)(B)(ii) as construed in Taylor, we have read the former's "otherwise" clause to include breaking and entering (i.e., burglary) of buildings other than dwellings.

233 F.3d at 110 n.6. With respect, I do not see how the Commission's choice of limiting words (burglary of a dwelling) is a slight discrepancy to be cured by the court's harmonizing it with different language in a different statute and a Supreme Court opinion interpreting that different statutory language. But see Rodriguez, 311 F.3d at 439 ("When read together, Peterson and Fiore merely illustrate the truism that, in certain circumstances, definitional differences exist between the ACCA and the career offender guideline.").

13

Without the First Circuit precedents, the plain language of the Guideline and Commentary would lead me to reason in Giggey's case as follows: neither burglary of a garage nor burglary of a redemption center is burglary of a dwelling.[16] The elements of Giggey's two burglaries did not include actual, attempted or threatened physical force against another person. The charging documents did not mention explosives. The charges of burglarizing a garage and a redemption center did not "otherwise" (*i.e.*, otherwise to charging burglary of a dwelling, physical force, or explosives) expressly charge conduct that "by its nature, presented a serious risk of potential physical injury to another." Unless the Commission's limiting term "of a dwelling" has no significance, I would find that Giggey's previous convictions for burglary were not convictions for crimes of violence.

But instead, I follow the binding First Circuit precedents and treat Giggey as a career offender.

Finally, I emphasize what others have already noted: there is a deep Circuit split on this issue. The First Circuit is clear that a burglary of *any* structure is always, categorically, a crime of violence; only the Eighth Circuit follows the First. United States v. Hascall, 76 F.3d 902 (8th Cir. 1996). The other Circuits that have addressed the question (Fourth, Fifth, Sixth, Tenth, Eleventh) all hold that

---

[16] I debated whether burglary of a garage should be treated as equivalent to burglary of a dwelling on the basis that somehow it is appurtenant or within the curtilage. The state authorities did not think so. Initially they charged both burglary of the dwelling (a class B crime) and burglary of the garage (a class C crime). Ultimately Giggey was convicted of only the latter. Certainly the prosecution here presented no evidence to suggest that this garage should be considered part of
*(continued next page)*

burglary of a non-dwelling is *not* per se a crime of violence.  See, e.g., United States v. Wilson, 168 F.3d 916 (6th Cir. 1999); United States v. Jackson, 22 F.3d 583 (5th 1994) ("Jackson I")[17]; United States v. Harrison, 58 F.3d 115 (4th Cir. 1995); United States v. Smith, 10 F.3d 724 (10th Cir. 1993); United States v. Spell, 44 F.3d 936 (11th Cir. 1995).[18]  This differing interpretation of the career offender Guideline is not merely a matter of esoteric interest to judges and lawyers.  In fiscal year 2006 there were 2,124 career offender sentences.  Of sentences appealed, 72 involved application of the 4B1.2 definition of crime of violence.[19]  This particular Circuit split creates real and significant nationwide disparity in sentencing.  Here, for example, if Giggey had been prosecuted in the Fourth, Fifth, Sixth, Tenth or Eleventh Circuits, he would not be a career offender and would be facing only 63 to 78 months.  A primary reason that Congress adopted Sentencing Guidelines was to avoid these sorts of disparities in sentencing practices among federal judges from district to district around the country.  This particular disparity has existed since at least 1993.  The

---

the dwelling (understandably so, given the scope of the First Circuit precedents on burglaries). In any event, the issue affects only one conviction, and two are required for career offender treatment.

[17] The proposition in Jackson I that burglary of a non-dwelling is not per se a crime of violence seems to have survived later Fifth Circuit case law regarding the scope of materials courts may consult in determining whether a conviction is a crime of violence under 4B1.2.  See United States v. Jackson, 220 F.3d 635 (5th Cir. 2000) ("Jackson II") (explaining that Jackson I improperly relied on conduct beyond the charging document in determining whether the burglary of a non-dwelling crime was a crime of violence) (overturned on different grounds in United States v. Charles, 301 F.3d 309 (5th Cir. 2002) (*en banc*)).

[18] Some have suggested that the Fourth, Tenth and Eleventh Circuits hold that non-dwelling burglaries can *never* be crimes of violence for career offender purposes, see, e.g., Wilson, 168 F.3d at 926 n.7 (citing Harrison, Smith, and Spell for the proposition that in those Circuits "burglary of a building other than a dwelling is never a crime of violence.").  I do not believe that it is necessary to read those cases that broadly.  See, e.g., Smith, 10 F.3d at 733 (answering only the question of whether "mere" burglary of a non-dwelling is a crime of violence).

[19] United States Sentencing Commission, 2006 Sourcebook of Federal Sentencing Statistics 49, *(continued next page)*

15

Commission apparently has tried to deal with it, but for reasons unknown has been unable to craft a solution.[20] The Circuits' differing interpretations of the Commission's language therefore cry out for Supreme Court intervention to articulate a single national standard based upon the Guideline language as it stands.[21]

### *Guideline Departure*

It is true that I can ameliorate some of the unjust disparity by a Guideline departure, and I do so, as far as I can, but my authority is limited. A Guideline departure does not permit me to give Giggey the sentence he would receive without career offender status. I depart because I find Giggey's criminal history as a career offender to be grossly overrepresented. USSG 4A1.3(b)(1). Giggey does not have the previous convictions typical of a career offender, involving crimes of violence (actual, threatened or attempted physical violence, explosives, residential burglaries, or drug felonies). The state sentencing justices recognized the small-time nature of what Giggey did in his previous crimes: he got 4 months in jail for the redemption center burglary (it occurred at 10 p.m.); he got 90 days for the burglary of a detached garage at a seasonal home in the off season.[22] Giggey's

---

150 (2007).

[20] Unsuccessful attempts at revision are documented in Smith, 10 F.3d at 733, and in Comment, supra n.14, at 691-92.

[21] A Circuit split is said to be a very important factor in determining which cases the Supreme Court will hear. See, e.g., Tony Mauro, "Alito Reflects on his Role on the High Court," Law.com (August 9, 2007), http://www.law.com/jsp/article.jsp?id=1186563716757. This one should qualify. This division of opinion among the Circuits is not one that is breeding healthy experimentation, or one that needs time for the arguments to mature. The division is stark, it has existed almost fifteen years, and it creates unjust and unfair differences in sentences depending on where a defendant is convicted geographically.

[22] I did not use this information in my Guideline calculations because 4B1.2 requires attention to
*(continued next page)*

16

history is shockingly different from those career offenders who previously committed physical violence, used explosives, or invaded homes. But the Guidelines limit me to a single-level downward departure in Giggey's criminal history for this overrepresentation. USSG 4A1.3(b)(3)(A). I therefore reduce his Criminal History from VI to V.

As a result, the sentencing range is 140 to 175 months, still more than double what Giggey would get if his garage and redemption center burglaries were not treated as crimes of violence.

It is tempting to consider the length of the resulting sentence as a variance ground, under United States v. Booker, 543 U.S. 220 (2005), given the much lower sentence Giggey would get if he were being sentenced in, say, Virginia or Oklahoma. But to do so would be unfaithful to my responsibility as a district judge to follow First Circuit precedents.

I confess that I am somewhat uncertain how to deal with Booker's section 3553(a) factors once I finish the Guideline analysis. On the one hand, the Supreme Court stated explicitly in Rita this past June that the sentencing judge may not treat the Guideline sentence as presumptively the correct sentence:

> In determining the merits of [prosecution and defense arguments to impose something other than a Guidelines

---

the conduct "expressly charged." USSG 4B1.2, Application Note 1. See also Shepard v. United States, 544 U.S. 13 (2005) (limiting materials consulted in Armed Career Criminal Act case); Taylor v. United States, 495 U.S. 575 (1990) (same); United States v. Winn, 364 F.3d 7, 9 (1st Cir. 2004) (in career offender cases, limiting materials that can be consulted because of the "categorical" nature of the inquiry). I do consider it here in the departure section. The Presentence Report obtained the information from police reports and from the guilty plea transcript for the redemption center burglary. The prosecutor agreed with the information at Giggey's sentencing hearing here.

> sentence], the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.

Rita v. United States, 127 S.Ct. 2456, 2465 (2007).[23] On the other hand, the First Circuit says that "the farther the judge's sentence departs from the guidelines sentence, the more compelling the justification based on the factors in § 3553(a) that the judge must offer." United States v. D'Amico, 2007 WL 2253494 *8 (1st Cir. Aug. 7, 2007) (quoting United States v. Thurston, 456 F.3d 211, 215 (1st Cir. 2006). D'Amico says in a footnote that its treatment is consistent with Rita, id. at *10 n.10, but there is at least a tension over what weight the sentencing court should give the Guidelines sentence.

If I follow Rita's admonition to treat the Guidelines sentence as nonpresumptive, and look at the section 3553(a) enumerated factors, what do I conclude?

    1.    The nature and circumstances of the crime and Giggey's history and characteristics, 3553(a)(1), call for a stiff sentence. Arson is serious. Giggey had a difficult childhood, but so do many if not most of the people I sentence. Giggey has had several run-ins with the law.

    2.    Punishment, seriousness, and respect for the law, 3553(a)(2)(A), call for a stiff sentence. Arson is deadly dangerous. This one easily could have been fatal.

---

[23] Rita allowed the Circuit courts to treat the Guidelines sentence as presumptively correct for appellate review purposes, but explicitly said that district judges could not treat it that way. 127 S. Ct. at 2463.

18

3.  Deterrence, 3553(a)(2)(B), calls for a stiff sentence. Neither Giggey nor others like him should think that arson can be committed with impunity.

4.  Protecting the public, 3553(a)(2)(C), calls for a stiff sentence. Although I believe that Giggey should not be considered a career offender, he does have a history of lawbreaking and has graduated to a new level with this arson conviction.

5.  Treatment needs, 3553(a)(2)(D), do not influence the sentence in Giggey's case.

6.  The kinds of sentences available, 3553(a)(3), do not influence Giggey's sentence.

7.  The Guideline range, 3553(a)(4), I have discussed above.

8.  Commission policy statements, 3553(a)(5), are not pertinent.

9.  Avoiding unwarranted disparity, 3553(a)(6), is the most perplexing. Within the First Circuit, it is important that I follow First Circuit precedent on career offenders and sentence accordingly. But in other Circuits, people who have committed burglaries of non-dwellings are not career offenders, so I create great disparity if I sentence Giggey differently from them.

10. Restitution, 3553(a)(7), does not influence the sentence. Giggey will never be able to pay a significant portion of the total restitution under any sentencing scenario.

In sum, the nature of the crime, the need to protect the public, to deter and to punish, and the nature of Giggey's criminal history all lead to a stiff sentence.

19

Avoiding unwarranted disparity and considering the Guideline range would lead me to sentence Giggey so as to bring his sentence more in line with how federal judges in other Circuits sentence comparable defendants. But I conclude that to compensate for the disparity created by the disagreement among the courts of appeals would be inconsistent with my responsibility as a district judge to follow my own court of appeals' precedents and would create disparity within the First Circuit. Because of the need to avoid that disparity, I therefore choose no variance under Booker, but choose a sentence at the bottom of the Guideline range after a one-level Criminal History departure.[24]

**SO ORDERED.**

**DATED THIS 16TH DAY OF AUGUST, 2007**

/S/D. BROCK HORNBY
**D. BROCK HORNBY
UNITED STATES DISTRICT JUDGE**

---

[24] Certain agreed-to adjustments, not pertinent to the two issues of this opinion, occurred at the sentencing hearing, including a 3-month adjustment under 5G1.3(b)(1) to reflect time served on the related state charge.